IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BRANDON D. BRADLEY, SR., a.k.a.
BRITTNEY HARDAWAY BRADLEY,

                Plaintiff,

    v.
                                                    OPINION and ORDER

DAVID MAHONEY, TOUA VUE,
BEN JENNINGS, MARTIN KNOLL, JACOB ZILLI,           20-cv-50-jdp
DERRICK WALKER, TIM ALGIERS, MATT EARLL,
DRITTAN LAZAMI, FRANK SMILGIS,
BERNARD BAKER, and JOHN KLEIN,

                Defendants.

---

Pro se plaintiff Brandon Bradley, also known as Brittney Bradley, is currently a prisoner at Green Bay Correctional Institution.[1] When Bradley was a prisoner at the Dane County Jail, she was taken to the hospital for kidney surgery. She contends that sheriff's office staff mistreated her by keeping her in restraints the entire time she spent at the hospital recovering from that surgery. I granted Bradley leave to proceed on claims under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

The parties filed cross-motions for summary judgment. I denied Bradley's motion for summary judgment because the parties' submissions showed that she was not entitled to judgment as a matter of law: Bradley's lengthy history of disruptive and dangerous behavior could lead a jury to conclude that defendants' use of restraints on Bradley was reasonable because the jury could draw the inference that she remained a genuine security threat even

---

[1] Bradley is a transgender woman. *See Bradley v. Novak*, No. 20-cv-48-jdp (W.D. Wis.). In keeping with the court's practice in previous cases, I will use feminine pronouns to refer to Bradley.

following her surgery. Dkt. 120; *Bradley v. Mahoney*, No. 20-cv-50-jdp, 2022 WL 767042 (W.D. Wis. Mar. 14, 2022). I reserved a ruling on defendants' cross-motion for summary judgment to obtain supplemental briefing from the parties. After reviewing the parties' supplemental materials, I will grant defendants' motion for summary judgment and dismiss the case because Bradley fails to present evidence that could lead a jury to conclude that defendants' use of restraints was unreasonable.

PRELIMINARY MATTERS

I begin with some preliminary motions. One of the reasons I directed the parties to provide supplemental summary judgment materials was that Bradley was not able to file a full response to defendants' motion for summary judgment because she no longer possessed a copy of medical logs from the hospital; defendants assert that the logs show no complaints from Bradley to medical staff about the restraints being painfully tight and no entries from medical staff about the restraints being too tight. Dkt. 120, at 3–4. I directed the clerk of court to send Bradley a new copy of those logs. *Id.* at 8.

In her supplemental briefing, Bradley objects to the logs she received, saying that those hospital records are not what she sought: she states that those records "are NOT the hospital logs from the deputies who guarded me at the hospital." Dkt. 133, at 1. I take her to be saying that what she had really requested was a separate set of logs created by deputies rather than the logs made by medical staff. But it was not clear from Bradley's original request that she sought the deputy logs rather than the medical staff logs, and there is no reason to think that she needed an additional copy of the deputy logs to complete her summary judgment briefing: Bradley already submitted copies of those logs in support of her own motion for summary

judgment. *See* Dkt. 59-3 through Dkt. 59-8. As a courtesy I will direct the clerk of court to send Bradley another copy of those logs, but there is no need for further briefing—Bradley has already submitted summary judgment materials discussing those logs and the contents of the logs are undisputed.

After supplemental briefing was completed, Bradley filed a motion for leave to file a motion to stay all of her pending cases in this court because of problems with the mail at her current prison.[2] Dkt. 136. More specifically, she states that she "has filed motions, responses, exhibits, and for over a week and a half I've received none of the documents, no responses from the court, or the exhibits back." *Id.* I will deny Bradley's motion as it pertains to this case because the alleged delays have not hampered Bradley's efforts in this lawsuit: Bradley's submissions make clear that she received defendants' supplemental filings, and defendants' motion for summary judgment is now fully briefed and ready for my review.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Bradley's Fourteenth Amendment claims concern jail staff's use of restraints on Bradley while she was in the hospital recovering from her kidney-removal surgery on September 26, 2017. The medical records show that surgeons planned to remove the part of one of Bradley's kidneys with a tumor. But closer inspection of the kidney after surgery started showed that the tumor had spread enough for surgeons to conclude that the entire kidney would have to be removed.

---

[2] The court has sanctioned Bradley by barring her from filing motions without first asking permission to do so. *See Bradley v. Van Norm*, No. 20-cv-49-jdp, Dkt. 77 (June 2, 2021).

Bradley recovered at the hospital until September 29. Bradley states that she awoke from surgery to find herself in four-point restraints. Deputies kept her restrained the entire time, even when she ate, used the restroom, bathed, or walked the hospital floor. In their original summary judgment briefing, neither party explained the exact method of restraint deputies used during these times.

In their supplemental materials, defendants provide declarations from two of the deputies who monitored Bradley while she was restrained following the surgery, defendant Marty Knoll and non-defendant Halee Reigstad. They both state that in general, hospitalized inmates are restrained with a shackle that looks like a longer set of handcuffs. Inmates are shackled to the bed at either one point (an ankle or wrist) or two points. The shackles are periodically rotated among an inmate's wrist and ankles. At certain points, such as when an inmate needs to use the restroom, walk around, or receive medical care, an inmate is unshackled from the hospital bed and secured in a different way: the inmate's ankles are shackled together, the inmate's arms are secured to a belly-chain, or both of these measures are taken together.

The deputies say that during their time with Bradley, these practices were followed. But these particular deputies were not stationed with Bradley the entire time (roughly three days) spent at the hospital post-surgery: Knoll covered one four-hour shift and Reigstad does not say when she was at the hospital, although the logs of deputies' observations of their supervision of Bradley at the hospital show her serving one shift.[3] Dkt. 128-1, at 4. They also present

---

[3] Bradley objects to Reigstad's declaration, stating that Reigstad isn't a defendant in the case and that she "is not aware of [Reigstad] being a material witness in the case." Dkt. 135. If what Bradley means is that Reigstad does not have firsthand knowledge of the events because she was not one of the deputies assigned to her detail, disregarding Reigstad's declaration would not change my analysis because Reigstad's declaration is virtually identical to Knoll's in all material respects.

4

entries from the deputy logs discussing how Bradley was secured. Examples of those entries include the following:

- "Bradley's left leg shackled to bed."
- "I/M up for walk 2 laps down hallway shackled."
- "Inmate is sitting up in bed. Leg shackles on both ankles."
- "I/M shackled to bed by right leg. I/M needed to use the restroom to defecate . . . . I/M was shackled w/ belly chain and one hand free along w leg shackles and allowed to use the restroom. . . ."
- "Inmate sleeping. Shackled to bed at right leg."
- "I/m took a walk fully shackled & escorted by deps."
- "I/m up using bathroom. Both legs shackled."
- "I/m back in bed, shackled to bed frame by Deputy Jennings, left leg."

Dkt. 128-1, at 3–4, 6–7.[4]

Defendants explain their rationale for keeping Bradley restrained post-surgery: they considered her to be a particularly unpredictable and dangerous inmate. They produce jail records showing that Bradley had a history of being disruptive, concealing shanks or other weapons, threatening to harm staff, and attempting self-harm. Considering only the month before Bradley's surgery, jail records show that Bradley brandished a sharpened toothbrush at a court hearing, she received medical attention after she inserted a toothbrush shank into her

---

[4] Bradley does not object to these logs as inadmissible hearsay, which they might be despite the business-records exception to hearsay, *see* Federal Rule of Evidence 803(6). Rather, she also cites them as evidence in her own summary judgment briefing. In any event, parties are allowed to present evidence at summary judgment that might not be in the proper form, but that could be brought in the proper form at trial. Fed. R. Civ. P. 56(c)(2); *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014), *reh'g denied* ("We note that the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." (emphasis in original)). So I will consider the logs; Bradley does not dispute their contents.

rectum to prevent jail officials from finding it, and she was found with shanks at least two other times, with Bradley saying that she was "homicidal" during one incident. Dkt. 100-1, at 10. In another incident, a pat-down search revealed that Bradley had concealed a broken shower head inside a sock. Multiple times Bradley made remarks about wanting to harm deputies. After a previous trip to the hospital, Bradley stated that she had tried to take a deputy's gun, and that she would have shot the deputy with it. On several occasions Bradley threw water or objects at staff.

Bradley posed a risk to herself multiple times that month. Deputies placed her on suicide precautions after they found a piece of torn bedsheet in her cell that they believed she was going to hang herself with. In another incident, Bradley began tying ripped bed sheets in the ceiling vent. Bradley twice made comments about using a shank to cut out her kidney.

Bradley also twice flooded her cell. In another incident, Bradley yelled, "I'm gonna keep fucking this shit up until I leave! I got two years in prison! I'm gonna fuck up the dayroom, the dayroom camera, my cell camera, and I'm gonna rip the phone off the wall! I'm gonna fuck up each cell until there is no cell left!" *Id.* at 32.

Bradley disputes that some of these incidents at the jail occurred, but the records are not submitted for the underlying truth that Bradley actually engaged in all of this misconduct, but rather to show that the officers were aware of the documented history of Bradley's misconduct, leading them to believe that she was particularly dangerous. Because of Bradley's recent record of behavior, Lieutenant Brian Mikula (who is not a defendant) ordered that at the hospital, Bradley was "NOT TO BE LET OUT OF RESTRAINTS AT ANY TIME!!" Dkt. 100, ¶ 6 (Mikula's declaration); Dkt. 128-1, at 1 (deputy logs).

Bradley states that post-surgery, she complained to the defendant deputies that her restraints were too tight. The deputies told her that she was restrained on the orders of defendant David Mahoney, then the Dane County sheriff. Bradley asked them to call Mahoney to remove the shackling order, but they refused. At one point a nurse asked whether it was necessary to restrain Bradley given that she had just had a kidney removed, and the deputy said, "You don't know this guy he's dangerous. Don't worry about him he's going to prison." Dkt. 112, at 2.

Bradley states that she repeatedly told nurses and defendant deputies that she was in pain, with blood in her urine and stool. The deputy logs show Bradley once complaining of pain (with no further explanation of the location of the pain given), once complaining of stomach pain, and twice complaining of blood in her urine. Dkt. 128-1, at 4, 7. Deputies would not remove the restraints. Instead, she states that they told her multiple times that "this is what [she] deserved for 'assaulting' staff." Dkt. 112, at 3. Bradley states that defendant Deputy Bernard Baker "threatened [her] with violence" by telling her "either you get up and walk the floor . . . or I'll make you." *Id.* at 3. The hospital staff's own medical logs of Bradley's stay do not show Bradley complaining of pain from tight handcuffs, nor do they show medical staff asking deputies to remove the restraints.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

I granted Bradley leave to proceed on claims under the Fourteenth Amendment's Due Process Clause against defendants Dane County Sherrif David Mahoney and jail employees

7

for their use of restraints on Bradley while she was in the hospital recovering from her kidney-removal surgery.

The Due Process Clause protects pretrial detainees like Bradley from the use of objectively unreasonable force, which includes the use of unreasonably painful restraints. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *O'Malley v. Litscher*, 465 F.3d 799, 805 (7th Cir. 2006) (excessive force may include application of painful restraints). Courts have concluded that "[t]he use of bodily restraints on a pretrial detainee amounts to unconstitutional punishment if their use is not rationally related to a legitimate non-punitive government purpose" and that shackling an inmate in the less-secure hospital setting could violate the Constitution. *May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000) ("[I]t is hard to see how shackling an AIDS patient to his or her bed around the clock, despite the continuous presence of a guard, is an appropriate policy for carrying out [a reasonable security] purpose."); *Terry v. Cnty. of Milwaukee*, 357 F. Supp. 3d 732, 755–56 (E.D. Wis. 2019) (policy mandating all hospitalized inmates be shackled could violate Fourteenth Amendment as applied to inmate during and after childbirth who was also lethargic from heroin and going through withdrawal). But in considering Fourteenth Amendment claims, this court must give "deference to policies and practices needed to maintain order and institutional security." *Kingsley*, 576 U.S. at 399–400.

One of the reasons I requested supplemental summary judgment briefing from the parties was that Bradley stated that she was placed in "four-point restraints," by which I took to mean that each of her arms and legs was tethered to the hospital bed. But it was implausible to suggest that Bradley remained restrained this way for her entire hospital stay because she states that she ate, bathed, and walked the hospital floor. I directed the parties to present a

8

more detailed explanation of how Bradley was restrained at the hospital. The supplemental briefing shows that Bradley was generally cuffed to her hospital bed by one of her ankles. The only reasonable inference from Bradley's reference to "four-point restraints" is the method deputies used to shackle Bradley when she was out of bed: her legs were shackled together and one or both of her hands were secured to a belly chain. That is, at some times, all four of her extremities were shackled, albeit not in the more extreme way I initially envisioned by Bradley's use of the term "four-point restraints."

Were the less harsh forms of shackling deputies actually used objectively unreasonable under the Fourteenth Amendment? Based on the record before me, I conclude that no reasonable jury could find in Bradley's favor. In *May*, the Court of Appeals for the Seventh Circuit stated that a policy of shackling hospitalized inmates would be "plainly excessive in the absence of any indication that the detainee poses some sort of security risk." 226 F.3d at 884. But here, there is ample evidence showing that Bradley was a security risk. Defendants say that they consider Bradley to be a particularly unpredictable and dangerous inmate, and they produce jail records showing that Bradley had a history of being disruptive, concealing shanks or other weapons, threatening to harm staff, and attempting self-harm. Absent other circumstances, it was entirely reasonable for Mahoney or Mikula to order that Bradley be restrained at all times, and for deputies to follow through on that order.

Bradley suggests that she was incapable of being disruptive or harming others after her surgery. She notes that a nurse once asked if the restraints were necessary, and she states that she did not engage in any disruptive behavior at the hospital. But the undisputed evidence shows that Bradley was not totally incapacitated; she was able to get out of bed for walks or to use the restroom. One comment by a nurse isn't enough to show that Bradley was incapable of

9

harming others, and her cooperative behavior at the hospital doesn't show that the restraints were unreasonable given her history prior to the surgery. Given the deference I must give to defendants' decisions on security matters, Bradley fails to show that her physical condition post-surgery was reason not to restrain her.

Another way that Bradley might succeed on this type of claim would be to show that regardless whether it was reasonable to keep her restrained, defendants did so in an unreasonable manner. She contends that the restraints were tight and that defendants would not call a supervisor to change their practice, even though Dane County Jail rules on restraints stated that a supervisor "shall monitor the use of restraints to ensure other options were examined prior to using restraints" and "shall ensure that the health staff is notified when restraints are used." Dkt. 59-10 and 59-11 (portions of the Dane County Sheriff Security Services Manual).

The discomfort typical of being handcuffed does not itself violate the Constitution when the use of handcuffs is warranted. *Cf. Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006) (officer did not violate Fourth Amendment when he applied handcuffs "somewhat too tightly" and plaintiff did not seek or receive medical care for any wrist injuries). Bradley provides almost no detail about the tightness of her restraints other than to say that she complained numerous times that they were too tight. That vague statement isn't enough for a reasonable jury to conclude that defendants violated her Fourteenth Amendment rights. *See Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018) ("Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough." (internal quotation marks and alterations omitted)). Bradley does say that she complained of stomach pain and blood in her urine and stool, but those are injuries unrelated to her handcuffing; they're the result of her

invasive surgery. And Bradley does not provide facts explaining how her post-surgical pain was exacerbated by the shackling methods at issue here, much less showing that it was unreasonable for defendants to use those methods given her history of disruptive and threatening behavior. Bradley also contends that defendants violated their internal policies by refusing to update a supervisor on Bradley's complaints or notify health staff. But a violation of an internal policy alone does not violate the Constitution, *Langston v. Peters*, 100 F.3d 1235, 1238 (7th Cir. 1996), those policies don't explain how deputies should consider the ongoing use of restraints in a hospital setting, a supervisor had already approved the use of restraints, and in any event it is undisputed that Bradley was being monitored by hospital medical staff, who did not note concerns about the restraints in their medical logs.

Bradley argues that defendants' comments show that they forced restraints on her not for security reasons but to punish her for her previous assaults of staff. Defendants' alleged comments that the restraints were "what [she] deserved for 'assaulting' staff" seem more straightforwardly to be an explanation of why she was restrained in the first place as opposed to proof of intent to punish. But in any event, the question under the Fourteenth Amendment is an objective one, made from the perspective of a reasonable officer on the scene, not the subjective beliefs of the actual defendant. *Kingsley*, 576 U.S. at 397. I have already concluded that it was objectively reasonable to restrain Bradley; these comments do not change that conclusion.

Bradley also states that defendant Baker "threatened [her] with violence" by telling her "either you get up and walk the floor . . . or I'll make you." Dkt. 112, at 3. But Bradley does not explain enough about this altercation to support a Fourteenth Amendment claim. Baker may have made an intemperate remark, but Bradley does not suggest that Baker actually used

11

unlawful force against her or that she was harmed by walking the hospital floor on that occasion. If Bradley's point is that the remark shows that Baker meant to punish her with the restraints, this argument fails for the same reason as her argument regarding defendants' comments about her getting what she deserved.

Courts often observe that summary judgment requires the party with the burden of proof to "put up or shut up," pointing to evidence from which a reasonable jury could find in its favor of each element of its claim. *See, e.g., Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020). Bradley's vague account of events could not lead a jury to conclude that defendants acted objectively unreasonably, particularly given her documented history of disruptive and threatening behavior and the deference that must be afforded jail officials in determining security-related matters. I will grant defendants' motion for summary judgment and dismiss the case.[5]

ORDER

IT IS ORDERED that:

1. Plaintiff Brandon D. Bradley's motion regarding deputy hospital logs, Dkt. 133, is GRANTED in part. The clerk of court is directed to send plaintiff a copy of those logs, Dkt. 128-1.

2. Plaintiff's motion for leave to file a motion to stay her pending cases, Dkt. 136, is DENIED.

---

[5] Defendants also contend that they are entitled to qualified immunity on Bradley's claims. Because I am dismissing Bradley's claims on the merits, I need not consider defendants' qualified immunity arguments.

3. Defendants' motion for summary judgment, Dkt. 97, is GRANTED.

4. The clerk of court is directed to enter judgment accordingly and close this case.

Entered April 25, 2022.

                                    BY THE COURT:

                                    /s/

                                    _____
                                    JAMES D. PETERSON
                                    District Judge